### Colston v. Commonwealth.

(Decided October 26, 1926.)

### Appeal from Franklin Circuit Court.

1. Homicide.—Verdict of guilty of "manslaughter," fixing punishment at 21 years' imprisonment, fixed degree of offense, as required by Criminal Code of Practice, section 257, subdivision 2, as voluntary manslaughter.

2. Homicide.—Instruction that killing in sudden affray or sudden heat and passion, without previous malice, and not in self-defense, was manslaughter was not prejudicial because accidentally omitting word "voluntary" before manslaughter.

3. Criminal Law.—Errors not prejudicing defendant's substantial rights are not ground for reversal.

4. Homicide.—Only where facts justify instruction on involuntary manslaughter, and no instruction thereon is given, is definition of voluntary manslaughter, omitting "voluntary" before manslaughter, prejudicial.

5. Homicide.—In homicide case, jury held warranted in concluding that deceased and accused were men of much the same type as to character and quick temper.

6. Homicide.—Court will not reverse conviction of voluntary manslaughter, unless palpably against evidence.

7. Homicide.—Evidence held to sustain conviction of voluntary manslaughter.

8. Criminal Law.—Conviction of voluntary manslaughter will not be reversed on ground that jury received evidence out of court and

were prejudiced, because deceased's father, wife and child boarded
at hotel at which sheriff kept jury.

9.   Criminal Law.—Newly discovered evidence will not be ground for
     new trial, unless it might reasonably be expected to change the
     result.

L. F. JOHNSON and W. C. MARSHALL for appellant.

FRANK E. DAUGHERTY, Attorney General, and G. D. LITSEY,
Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Sam Colston was indicted for the murder of Thorn
Barton.  On the trial of the case he was found guilty of
manslaughter and his punishment fixed at twenty-one
years in the penitentiary.  He appeals.

The court instructed the jury, that if the killing was
done by the defendant with malice aforethought and not
in self-defense, they should find him guilty of murder. He
also instructed them that, if it was done in sudden affray
or in sudden heat and passion, without previous malice
and not in self-defense, they should find him guilty of
manslaughter and fix his punishment at confinement in
the penitentiary for not less than two nor more than
twenty-one years.  The jury, following the instruction
of the court, found the defendant guilty of manslaughter
and fixed his punishment at twenty-one years in the peni-
tentiary.

It is earnestly insisted that manslaughter may be
either voluntary or involuntary, and that the punishment
for one is different from the punishment for the other.
By section 257, subsection 2 of the Code, a verdict should
fix the offense and the degree of the offense and the pun-
ishment in cases in which the jury is required to fix the
degree of punishment.  It is insisted that the verdict of
the jury here does not fix the degree of the offense.  But
the verdict of the jury simply followed the instruction of
the court in which the court, by clerical error, accident-
ally omitted the word "voluntary" before the word
"manslaughter."  The meaning of the instruction, taken
as a whole, is clear.  The jury were in nowise misled, and
the defendant was in nowise prejudiced.  Under the Code
errors which do not prejudice the defendant's substan-
tial rights are not ground for reversal.  In a number of

cases judgments have been affirmed by this court where the verdict was in just this form. Sparks v. Com., 3 Bush 111; Chrystal v. Com., 9 Bush 669; York v. Com., 82 Ky. 360. It is only where the facts justify an instruction on involuntary manslaughter and no instruction on involuntary is given, as in Spriggs v. Com., 113 Ky. 724, that the form of the instruction could be prejudicial.

It is also insisted that the verdict is palpably against the evidence. The facts shown by the proof for the Commonwealth are these: Barton and Colston were working in the Duvall garage in Frankfort. Barton was a partner with Duvall. Colston was an employee of the firm. Barton was twenty-nine years old and Colston twenty-four. Barton was about thirty pounds heavier than Colston. They were sitting together in front of the garage about seven o'clock talking. Duvall came in and went back to where a negro boy was putting on a tire. While he was there Charles Lawrence came in to pay a bill. Duvall then called out to Barton to know if he had made out Lawrence's bill. No answer was returned, and Duvall called out a second time. About this time a sound of scuffling was heard at the front. Duvall and Lawrence went to the door. When they reached the door Colston and Barton were scuffling. Barton had his arm around Colston's neck, holding Colston with his back to him. Duvall said, "Stop, cut that out, boys." About this time they separated. Barton ran from where they were to the door of the garage; as he turned, he was heard to say to Colston, "Put up that knife." Colston followed him rapidly with a pistol in his hand. When Barton reached the door of the garage he turned and went through the office door, and was going in the direction of the desk in the office. When Colston reached the door of the garage, holding his pistol in both hands, he fired a shot at Barton in the office which struck him two inches above the left nipple, and from which he died a few minutes later. Duvall was then going into the office and the bullet passed near him.

On the other hand, Colston's statement as to how the difficulty came up while they were sitting out on the pavement is in these words:

"I said to him, 'That fan that I told you I had upstairs that I told you you could have, they have packed it up, I will have to let you have it another

time.'. He said, 'I sent up there and got it.' 'I said, 'When? When I was down the street?' He said, '.Yes.' I said, 'Why didn't you wait until I came back?' He said, 'Well, I didn't want to steal the damn fan.' I said, 'You are welcome to it.' He said, 'You ain't sore about it, are you?' I said, 'No, I ain't sore about it, but since you have said that much about it I don't think so much about it.' He said, 'There the fan is, go in and get it.' I said, 'I don't want to have any hard feelings about it; I told you you could have the fan, but I don't think much of you sending into my house when I wasn't at home.' He said, 'Do you want to fight about it?' I said, 'No.' He said, 'Take those damn glasses off and I will mash your face.' I got up and taken off my glasses and put them on the concrete in front of the garage. As I raised up Barton clinched me and put his arm around my neck and began to beat me in the head with the other arm and begin to carry me up the sidewalk, and right at the corner of the entrance to the garage, between that and the gas tank, and Mr. Duvall came out. Mr. Duvall walked up back of me and said something to him, said 'Thorn, don't do that; you boys stop;' said, 'Don't do that.' Then Mr. Duvall disappeared; I didn't see him any more. By that time we scuffled on up right into the line of the garage door, where I heard Mr. Charlie Lawrence state that he looked down the street and saw us scuffling. I got a better hold with my feet in the entrance and twisted out of Barton's arms. I grabbed at Barton and he darted into the office door to this desk. When he did that I knew those guns were there, and had been kept there all the time, and just as he went into this door he said, 'You son of a b——, I will kill you.'. When he said that I happened to think about a gun that I had and I knew it was to shoot or be shot then.''

Barton had no pistol at the time he was shot, but the proof shows that when he was shot he was not far from the desk and that a pistol was usually kept in the drawer of the desk. The defendant's statement that Barton said, ''I will kill you,'' or said anything as he went in, is contradicted by the other witnesses, none of whom heard this, and the defendant's own version as to how the difficulty originated is so unsatisfactory that it is not surprising

that the jury did not accept it; for, according to all the testimony he and Barton had been good friends up to that time. Barton had gotten him to leave another garage and come there and work with him, and there had been no previous difficulty or bad feeling between them. The defendant proved a good character, and also introduced some proof tending to show that Barton was a man of very quick temper, but, on the whole the jury were war- ranted in concluding that they were both men of much the same type. In cases of this character the court does not disturb the verdict of the jury, unless it is palpably against the evidence, and this cannot be said here.

It is also insisted that the jury received evidence out of court and were prejudiced against the defendant. The facts relied on to show this are that Barton's father and his wife and child boarded at the Hunt Hotel in Frankfort. The sheriff took the jury to the Hunt Hotel while they were kept together under the order of the court. But there is no showing that anything improper occurred, and the judgment cannot be distured on this ground.

The new evidence offered on the motion for a new trial was entirely cumulative, and not of a decisive character. It is a well settled rule that newly discovered evidence will not be ground for a new trial, unless of such character that it may reasonably be expected to change the result. That is not the case here.

The instructions to the jury are in the usual form and have been often approved.

Judgment affirmed.